Slip Op. 99 - 121

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| HITACHI AMERICA, LTD. and | : | Court No. 93-06-00373 |
| HITACHI, LTD. | : | |
| Defendant, | : | |

[On remand from a decision of Court of Appeals for the Federal Circuit, assessment of civil penalty against Hitachi America, Ltd.]

Dated: November 5, 1999

*David W. Ogden*, Acting Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, (*James W. Poirier*, *Cynthia B. Schultz*, and *Lesleyanne Kessler*); of counsel: *Judith L. Altman*, *Colleen M. Piccone* and *Alan C. Cohen*, United States Customs Service, for plaintiff.

*Weil, Gotshal & Manges LLP* (*John R. Wing*, *Yoav M. Griver* and *Tillie Lim*) for defendant Hitachi America, Ltd.

*Kirkland & Ellis* (*William A. Streff*, *David G. Norrell*, *Eugene F. Assaf*, and *Paul F. Brinkman*) for defendant Hitachi, Ltd.

### MEMORANDUM OPINION

Previously, this Court found Hitachi America Ltd. ("HAL") and Hitachi, Ltd. ("Hitachi Japan") negligent with respect to the declared dutiable value(s) of 41 entries of 120 subway cars and parts imported between June 16, 1984 and May 27, 1987 for use by the Metropolitan Atlanta Rapid Transit Authority ("MARTA"). *United States v. Hitachi America, Ltd.*, 21 CIT ___, 964 F.Supp. 344 (1997). The decision was appealed. In *United States v. Hitachi America, Ltd.*, 172 F.3d 1319 (Fed.Cir. 1999), the Court of Appeals for the Federal Circuit ("CAFC") *inter alia* reversed judgment on Hitachi Japan and affirmed that HAL was negligent in declaring the dutiable transaction in US

dollars rather than yen, but noted that the penalty had been assessed on "domestic transaction value (based on dollars) rather than on . . . import transaction value (based on yen)". 172 F.3d at 1335. The case has therefore been remanded for further proceedings. Although the CAFC affirmed a finding of negligence and the assessment of a penalty against HAL, its decision requires the government to "bear the costs of HAL and Hitachi Japan as well as its own costs." 172 F.3d at 1338. Since then, Slip Op. 99-119 (Nov. 3, 1999) entered judgment in accordance with the CAFC's decision for Hitachi Ltd. This memorandum addresses the amount of the civil penalty against HAL and presumes familiarity with the decisions on the case.

19 U.S.C. § 1592(c)("Maximum penalties") states that negligence is punishable by the lesser of the domestic value of the merchandise or twice the "lawful duties". Either case requires a proper determination of the "price actually paid or payable" for imported merchandise. *See* 19 U.S.C. § 1401a(b)(1). The Court's prior opinion, 21 CIT at ___, 964 F.Supp. at 351, described MARTA's public contract ("CQ-311") with the importing joint venture, consisting of HAL (the importer of record) and C. Itoh America ("CIA"), and also the government's concern regarding payment of "economic price adjustment" ("EPA") and "monetary value adjustment" ("MVA") clauses on the price actually paid or payable for the imported subway cars and parts. EPA payments address the risks of labor and material cost inflation. MVA payments cover the risk of currency exchange rate fluctuation. MARTA agreed to absorb both risks. CQ-311 therefore required MVA payments at a yen/dollar rate fixed as of the "Base Contract Award" (*i.e.*, ¥269.7:$1.00) and calculation of EPA on foreign labor and EPA on foreign material by reference to certain statistics published by Japan's Ministry of Labor and The Bank of Japan. *See* Government's Exhibit 1754, Articles 65 and 59, respectively. MVA and EPA thus provided certainty to the supplier's income stream.

Under CQ-311's terms, MARTA could choose to pay foreign labor and material costs in US dollars or in yen at the rate of ¥269.7:$1.00. The invoices to MARTA itemized those payment obligations as required. MARTA chose to make all foreign-source payments to HAL/CIA in US

dollars and in accordance with the invoices received[1]. CIA, acting as a banker, exchanged an amount equivalent to these dollars for yen at the rate of ¥269.7:$1.00 (except for EPA payments, which it converted at the rate of ¥268.835:$1.00, a difference of ¥0.865 or 0.0032%), and remitted yen corresponding to MARTA's payments to its parent, C. Itoh Japan ("CIJ"). Separately, Hitachi Japan, the manufacturer, invoiced CIJ for payment in yen corresponding to the contract amounts MARTA was obligated to pay HAL/CIA, albeit in amounts corresponding to the rate of exchange of ¥268.7 for each $1.00 of payment expected from MARTA. That is, Hitachi Japan's invoices evince the understanding that CIJ provided 1 yen of value for each dollar transacted[2]. *See* Government's Exhibit 1763.

The government proffered the amount of "lost" duties via audit of MARTA's EPA and MVA payments based on HAL's records. Government's Exhibit 1605. Mr. John Kessler conducted the work of the audit and was supervised by Mr. Eugene Donohue. Mr. Kessler's working papers were admitted into evidence as Exhibits 1618A. One of Mr. Kessler's working papers[3] consisted of separate EPA or MVA amounts listed in US dollars by check number and paid by MARTA. None of these payments were tied to specific entries. Total EPA for foreign labor and materials and foreign MVA amounted to $2,816,588, (–$877,591), and $18,509,992, respectively, hence Customs determined total "undervaluation" of $20,448,989. The applicable duty rate varied during the time in issue between 4.75% and 4.10% from year to year: as applied to each payment liability, the process revealed $851,455.32 in "lost revenue" to Customs. These results were reported to HAL on December 12, 1990. Thereafter, Customs increased "lost revenue" to $947,854 according to

---

[1]   Except as to the last invoice. *See infra*, footnote 4.

[2]   As a random example, for fulfilling a base-buy milestone D event, HIA/CIA billed MARTA $286,740. Of this amount, the payment records reflect ¥24,746,809 remitted from CIA to CIJ, whereas Hitachi Japan invoiced CIJ for ¥24,499,065. *See* Government's Exhibit 1763 at 1799 and supporting documentation.

[3]   "Analysis of Billings/Payments for Foreign EPA and Foreign MVA Under Contract CQ-311", *see* Government's Exhibit 1618A.

additional importation information which revealed $2,317,295 in additional undervaluation. This amount derived entirely from MVA invoices (including one for $2,040,933 disputed by MARTA[4]) and was reported on November 28, 1994.

Counsel for the defendants argued that the appropriate transaction value in this instance was between Hitachi Japan and CIJ. However, they introduced only evidence of HAL/CIA-to-CIJ payments during cross-examination of Mr. Donohue. At the government's request, in advance of trial, Mr. Donohue had prepared an alternative analysis of the stream of payments from the United States to Japan. This involved allocation to each entry of yen remitted from HAL/CIA to CIJ based on the number of cars entered. In his latest set of figures, Mr. Donohue allocated ¥98,467,086 to each of the 30 "base buy" cars and ¥97,162,909 to each of the 90 additional cars, a total of ¥11,698,674,390. This was the amount of yen purportedly remitted from HAL/CIA to CIJ. The amount is apparently net of MVA payments, as compared with a yen translation of the government's audit figures. Conversion of these allocations into US dollars based on dates of exportation[5]

---

[4] With respect to the disputed invoice, Customs' report states:

> It is noted that there was a subsequent net settlement for $1,200,000 which considered both this disputed MVA liability[] as well as various other unrelated credits claimed by MARTA for late delivery, delays in invoicing, failure to deliver operating maintenance manuals, etc. This settlement did not itemize the agreements reached on the various elements involved therein. In order to protect the revenue of the United States Government, we have considered the $2,040,933 MVA liability as being paid.

Government's Exhibit 1617, Exhibit A, Note 9. Apparently Hitachi Japan received from CIJ the yen amount it expected, *i.e.,* as invoiced by HAL/CIA, irrespective of the settled amount.

[5] *See* 31 U.S.C. § 5151. This required conversion into dollars at the quarterly rate published by the Secretary of the Treasury for the quarter in which the merchandise had been exported unless no such rate had been published or if the published value published varied by at least 5 percent from a value measured by the buying rate at noon on the day the merchandise is exported, in which case the conversion was to have been made at the applicable "buying rate" on the day of export.

"loss of revenue" of $750,138.40. Mr. Donohue further revised these figures to exclude ocean freight and insurance costs (directly described, and allocated, in US dollars) of approximately $442,182 for the 30-car base buy and $2,315,048 for the 90-car options. *See* Defendants' Exhibit 535; Trial Transcript of June 5, 1996, lines 171-20 to 172-12, 192-20 to 192-25. The revised revenue loss amount according to this methodology was $632,102.23.

The government viewed the audit of MARTA's dollar payments, including MVA, as indicative of the lawful transaction value of the merchandise in accordance with 19 U.S.C. § 1401a(b)(1). The defendants urged acceptance of the HAL/CIA-to-CIJ duty figure. The prior opinion of this Court did not regard the CIJ "sale" to HAL/CIA as at "arm's length" and therefore found the government's proffered methodology acceptable, although in dollars and adjusted to account for the applicability of the statute of limitations as to 21 entries. 21 CIT ___, 964 F.Supp. at 381. The CAFC disagreed, finding

> [t]he sole dispute [to be] over which sales transaction must be used as a basis for calculating the penalty. The three available transactions are (1) the sale from Hitachi Japan to CIJ in Japan; (2) the sale from CIJ in Japan to the HAL/CIA joint venture in the U.S.; and (3) the sale between the joint venture and MARTA within the U.S. The value of the second sale, the import transaction value, was $632,102 (based on yen). The value of the third sale, the domestic transaction value, was $947,854 (based on dollars).

172 F.3d at 1335.

The first sale was not found applicable since there was observed agreement among the parties "that the correct transaction for penalty calculation purposes is the sale from CIJ to HAL/CIA". 172 F.3d at 1335. The CAFC therefore instructed use of that import transaction value in assessing the penalty. It is perhaps worth observing, however, that the presence of true MVA payments indicates a transaction is foreign-currency based. If a transaction is truly US dollar-based, there is no need for MVA. Since MVA payments are irrelevant to the perspective of this foreign currency-based valuation (with which the CAFC agrees, 172 F.3d at 1332), and since the evidentiary record confirms that "CIA did not send additional payments to CIJ for MVA receipts", 21 CIT at ___, 964

F.Supp. at 358, the penalty is therefore assessed in accordance with  19 U.S.C. § 1592(c)(3)(A)(ii) at twice the import transaction value of the result of the government's alternative methodology, or $1,264,204.46.

Judgment will enter accordingly.

—————————————————————————
R. KENTON MUSGRAVE, JUDGE


Dated:  November 5, 1999
        New York, New York